## Arnett, et al. v. Stephens, et al.

(Decided June 12, 1923.)

## Appeal from Magoffin Circuit Court.

1. Vendor and Purchaser—Assignment of Right, Title, and Interest in Oil Lease is No More Than Quitclaim.—An assignment of all the assignor's right, title, and interest in an oil and gas lease amounts to no more than a quitclaim deed, and the assignee received just the rights which the assignor had and no more.

2. Vendor and Purchaser—Assignee of Right, Title, and Interest of Assignor in Oil Lease Takes Subject to Equities.—The assignee of the right, title, and interest of his assignor in oil and gas leases is in no better position than his assignor to defend against outstanding equities.

3. Vendor and Purchaser—Assignor of Oil Lease is Not Warrantor and Assignee Not Bona Fide Purchaser.—An assignor of an oil and gas lease, unless by special covenant, is not a warrantor of title, and the assignee does not occupy the position of a bona fide purchaser.

4. Vendor and Purchaser—Quitclaim Deed is Good Against Only Such Equities as are Recordable.—Though the common law rule that one who took a conveyance of the right, title, and interest of his vendor stood in the same relation as his vendor, to any outstanding equities and unrecorded deeds, has been modified somewhat

with respect to quitclaim deeds and other written muniments of title under the recording acts of the several states, that rule has not been changed with reference to outstanding equities not evidenced by writing, and therefore not recordable.

5　Vendor and Purchaser—Distinction is Recognized Between Deed Conveying Property Without Warranty and One Conveying Only Interest of Grantor.—There is a well recognized distinction between a deed which purports to convey the land itself without a warranty of title and one which purports to convey only the right, title, and interest of the vendor.

6.　Vendor and Purchaser—Purchaser Under "Quitclaim Deed" Conveying Only Title of Grantor is Not Bona Fide Purchaser.—An instrument which merely purports to convey the right, title, and interest of the grantor is a "quitclaim deed," and the grantee thereunder is not a bona fide purchaser protected against outstanding equities.

7.　Vendor and Purchaser—Quitclaim Deed Puts Grantee on Notice of Grantor's Doubts as to Title.—A deed which is only quitclaim in form is sufficient to put the grantee on notice that his grantor has notice of his title and that he is getting a doubtful title.

8.　Vendor and Purchaser—Grantee Under Quitclaim Deed Must Inquire as to all Equities Incapable of Being Recorded.—A grantee under a quitclaim deed takes with notice of outstanding equities which he could by the exercise of reasonable diligence have learned of by an examination of all records affecting the title and by inquiries of persons in possession, or persons paying taxes, or those who from any record might have some interest in the property, and takes subject to all equities which were not recordable, such as the right between the original parties to have a reformation of a deed or writing.

9.　Reformation of Instruments—Evidence Held to Support Claim of Estoppel of Assignee of Lessee to Deny Mistake.—Evidence that an assignee of an oil lessee was informed by the lessor of a mistake in the description in the lease, when he sought to reinstate the lease after lapse for non-payment of rent, and by silence acquiesced in an agreement to reform the lease as a condition of avoiding the lapse, held sufficient to show estoppel of the assignee to deny the right to reformation, though the assignee denied that the lessor made such statement to him.

10.　Reformation of Instruments—Evidence Held to Show Mistake in Description in Oil Lease.—Evidence that a lessor under an oil lease had acquired his land in two separate tracts and that the land was described in the lease by naming the adjoining owners, one of whom had conveyed one of the tracts to the lessor, with testimony of the lessor and lessee that it was intended to exclude the tract so acquired from the lease, held sufficient to show a mistake entitling a junior lessee of that tract to a reformation of the original lease.

11.　Corporations—Not Always Charged with Knowledge of Promoters to Whom Stock is Issued.—A corporation is not always charged

with knowledge acquired by persons who, having organized it, subscribed for all of its capital stock and became its chief officers, as to defects in the title to a lease transferred by them to the corporation.

12. Corporations—Officer Must Disclose Defects in Title Conveyed to Corporation.—Officers of a corporation must deal fairly with it when selling property to or buying property from it, and must always disclose to the corporation any defects or insufficiencies in the title to the property which the officer is selling to the corporation.

13. Corporations—Not Charged with Knowledge of Officer Whose Interest was Opposed to Transmitting Information.—Notice is not to be imputed to a corporation merely because one or more of its officers have knowledge of the facts, especially where the circumstances show that it was to the interest of the officer not to communicate his knowledge to the corporation, so that it is presumed he did not do so.

14. Corporations—Charged with Knowledge Acquired by Officer While Acting Within the Scope of His Authority.—A corporation is charged with constructive knowledge of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment and within the scope of his authority, even though the officer or agent does not communicate his knowledge to the corporation.

15. Corporations—Company Held Not Chargeable with President's Knowledge of Mistake in Oil Lease Conveyed by Him to it.— Where one who subsequently became president of a corporation owned an oil and gas lease, interests in which he transferred to two other individuals who subsequently became the other officers, directors, and stockholders of the corporation, the corporation, after acquiring the lease, was not chargeable with its president's knowledge of a mistake in the description contained in the lease of which the other two officers had no knowledge.

DYSARD & ADAMSON and J. B. ADAMSON for appellants.

E. W. PENDLETON for appellees.

OPINION OF THE COURT BY JUDGE SETTLE—Reversing.

On July 12, 1916, J. W. Lemaster and wife executed and delivered to A. H. Adams, for a valuable consideration, an oil and gas lease on a tract of land in Magoffin county supposed to contain 200 acres. The property is described as follows: "Situated in State Road district, Magoffin county, Kentucky, on the waters of State Road fork of Licking river, and bounded as follows:

'On the north by the lands of Abel Caudill;
On the east by the lands of Warrick Bailey;

On the south by the lands of P. E. Caudill;

On the west by the lands of Abel Caudill, containing 200 acres, more or less.' ''

By its terms this lease was to run for ten years, provided certain rentals were paid quarterly in advance. This lease was assigned by A. H. Adams to N. P. Howard, by the following writing:

"Know All Men by These Presents: That I, A. H. Adams, for and in consideration of one dollar and other good and valuable considerations, the receipt of which is hereby acknowledged, have this 14th day of March, 1918, *transferred, conveyed* and sold unto N. P. Howard all my *right, title* and *interest* in the foregoing lease." This assignment was subscribed by A. H. Adams, acknowledged by him before a notary public and afterwards duly recorded. On June 16th, 1919, N. P. Howard assigned the same lease to V. M. Higgins for the recited consideration of one dollar, and this transfer, in so far as pertinent, reads: "Do hereby sell, convey and transfer all my *right, title* and *interest* in a certain oil and gas lease, etc.," and it is signed by Howard and acknowledged before a notary public. On the 19th day of June, 1919, Higgins assigned the said lease to Samuel J. Patrick for the recited consideration of one dollar, using these words: "Do hereby sell, convey and transfer *all my right, title* and *interest* in and to a certain oil and gas lease, etc."

On July 19, 1919, Lemaster and wife, who owned the land, executed and delivered to H. B. Adams a lease on a small tract of land supposed to contain twenty (20) acres as recited in the lease but which in fact contains only five or six acres, describing the lease by metes and bounds. This last boundary lies within the boundary described in the lease which Lemaster and wife made to A. H. Adams in 1916, if the original lease is read as construed by Patrick, but is not so included if the construction of Adams is correct. This oil territory having proven valuable the holders of the two lease contracts are litigating their rights in this action, which was brought by the holders of the junior lease against the holders of the senior lease, praying to be adjudged the owners of the small lease with all the rights and privileges granted by virtue of their contract and that their title be quieted, and for all general and proper relief. The defendants, E. L. Stephens, Samuel J. Patrick, A. D. Patrick and the Model Oil Company, the first three

being directors of the latter, filed a general demurrer to the petition and without waiving it filed an answer and counterclaim setting forth the granting of the lease by Lemaster in 1916 and the various assignments made thereof as above set out, and further pleaded that after the granting of the lease by Lemaster in 1916, and after the lease had been assigned several times Lemaster and wife executed an oil and gas lease on the small portion of the land theretofore leased by Lemaster and wife to A. H. Adams in 1916, and also pleaded that the small lease was wholly embraced within the original lease, that the original lease was placed on record long before the execution of the junior lease and that appellants well knew of its existence long before they acquired any interest in the junior lease. After averring that the holders of the junior lease were about to and would enter upon the property in controversy and begin to drill oil wells unless enjoined by the court, the answer of defendants prayed to be adjudged the owners of the entire lease as described in the original contract and for an injunction against the holders of the junior lease to prevent them from entering upon or drilling the lease. The cause being submitted the trial court dismissed the plaintiffs' petition and entered judgment declaring the original lease made by Lemaster to A. H. Adams in 1916 valid and covering all of the property of Lemaster, including the lands embraced in the junior lease. From this judgment the holders of the junior lease appeal.

It is the contention of appellants in their pleading and by Lemaster in his intervening petition, that the small boundary of land embraced in the junior lease was by mutual mistake of the landowner and the grantee in the original lease included within the boundary leased by the original writing; that it should not have been so included because the landowner and the lessee agreed upon a boundary excluding this part now covered by the junior lease. The evidence upon this point shows that Lemaster, an unlettered man, when approached for a lease upon his land by A. H. Adams proposed to lease him a certain part of his lands embraced in a deed to him by Rachel Gullitt and heirs but specifically reserved another tract which had been conveyed to him by Abel Caudill, and this last tract is the one upon which the junior lease was granted. Both Lemaster, the grantor, and Adams, the grantee, say that it was distinctly under-

stood between them that the lease was to cover only the Gullitt tract and was not to cover the Abel Caudill tract. This is also proven by other witnesses. Appellants, therefore, contend that as appellees were not innocent purchasers for reasons hereinafter set out appellants were entitled to a reformation of the lease so as to make that instrument correctly express the terms of the contract. We have in many instances reformed written instruments like the one under consideration which through mutual mistake of the contracting parties failed to express the terms of the contract actually entered into. Neal v. Wright, 130 Ky. 146; Hill v. Pettit, 23 R. 2001; Harvey Saunders, etc. v. Daniel Wilson, 6 Ky. Opinions 572; Mattingly and Wife v. Speaks, etc., 4 Bush 316.

In answer to appellants' contention that there was a mutual mistake between the original lessors and his grantee, Adams, the appellees now say the lease was transferred to them and they took and received it paying a valuable consideration therefor, without knowledge or information of any defect or insufficiency therein and as innocent purchasers are entitled to protection. In avoidance of this appellants say that the transfer or assignments of the lease from A. H. Adams to Howard and from Howard to V. M. Higgins and from V. M. Higgins to Sam J. Patrick and from Sam J. Patrick to the Model Oil Company, a corporation, were mere quitclaims, or transfers of such rights, title and interest as belonged to the assignors at the time of the making of the several assignments and no more, and did not afford protection to appellees as *bona fide* purchasers, as is usually the case when real property is conveyed by deed clear on its face; and in making this contention they rely upon the broad view taken in a great number of cases, where such assignments or quitclaim deeds have passed between the parties, holding that only the title or interest of the grantor at the time the deed is made is purported to be conveyed, and that one claiming under such a deed or assignment cannot claim protection as a *bona fide* purchaser, or any greater interest than his grantor then in fact had, and therefore takes subject to outstanding equities and prior unrecorded deeds. See 27 R. C. L., p. 733; 39 Cyc. 1693, and 1694, 15 Am. State Reports 850; 12 Am. St. Reports 237; 18 C. J. 314-315; 19 Am. & Eng. Anno. Cases 320, and notes; 29 R. C. L. 2.

The assignment transferring the leasehold from Adams to Howard and thence through mesne assignments to the corporation, was no more than a quitclaim. The assignee of the lease received just such rights as the assignor had and no more. Thornton on Oil and Gas, p. 352. These writings purported to invest the assignee with only such *right, title and interest* as the assignor had at the time of the making of the assignment, and if he had no title or his title was defective or was subject to outstanding equities, the assignee was in no better position to defend than was his assignor. This is the rule established and faithfully adhered to by courts of last resort in a majority of the states, as well as in the U. S. Supreme Court and other federal courts. If, then, appellees by reason of taking an assignment of the right, title and interest which A. H. Adams, the original grantee in the lease, had in the leasehold, and if, as contended by appellees, the described boundary through mutual mistake of the parties to the original lease, included more land than was intended and more than it was agreed said lease should cover, then the appellee corporation is in no better position to defend than was A. H. Adams, the original grantee, who admits that through mutual mistake the lease contract did describe and include more land than was intended to be leased. The evidence on this point is quite strong. An assignor of a lease, unless by special covenant, is not a warrantor of title, and the assignee does not occupy the position of a *bona fide* purchaser.

"No covenants for title are implied in the assignment of a lease. Although the word 'grant' or 'demise' will in a lease create an implied covenant against the lessor, yet the same words in an assignment will not create an implied covenant against the assignor, the object and intent of the parties in making an assignment being to put the assignee in the place of the lessee; when that is done, the assignor ceases to have any further concern with the contract unless he has bound himself by express covenants." 16 R. C. L., p. 843; note, 32 Am. Dec. 356; Miles v. The United Oil Co., 192 Ky. 542.

"The protection afforded a *bona fide* purchaser by a court of equity extends, as a general rule, only to persons purchasing and acquiring the legal title, and not to the purchaser of an equitable title." 27 R. C. L. 688.

At common law one who took a conveyance of the right, title and interest of his vendor acquired only such chances of title as were in his vendor and stood in the same relation to any outstanding equities and unrecorded deed which his grantor occupied.   Washburn on Real Property, section 2239.

The rule has been modified somewhat with respect to quitclaim deeds and other written muniments of title which have been made recordable under the acts of the several states requiring such instrument to be recorded before effective against purchasers and creditors.  The general rule seems to be that a quitclaim deed, in the strictest sense, which purports to convey only the right, title and interest of the vendor, if recorded, will prevail over a deed of bargain and sale which is unrecorded or which was executed and recorded after the recordation of the quitclaim.  But this rule applies only to deeds and other writings purporting to convey title or an interest in the property and has no reference whatever to and can have no application whatever to outstanding equities which are not evidenced by such deed or other writing.  This modification of the common law rule with respect to quitclaim deeds is rested solely upon the legislative acts of the several states requiring conveyances of real estate to be recorded, and these acts relate only to such written muniments of title as are capable of being recorded.  It does not affect or in any way change the prevailing rule that outstanding equities, not evidenced by such writing, are not concluded by a quitclaim deed; and a purchaser who takes only the right, title and interest of his vendor to real property, is not clothed with the protection afforded a *bona fide* purchaser with respect to outstanding equities not evidenced by a recordable writing, but protected only according to the terms of the act requiring the lodgment for record of all deeds and other title papers.  The rule is well stated in Hendricks v. Calloway (Mo.), 111 S. W. 60; Star v. Bartz (Mo.), 117 S. W. 1125, where it is in substance held that a quitclaim deed does not bar outstanding equities which are not the subject of record and to which the recording act does not apply.  Equities which arise from transactions or a state of facts which are not required to be in writing, or which need not be recorded, if in writing, are not to be cut off by a quitclaim deed.  As to such it has only an effect, coextensive with its terms, of recognizing

such rights and interest as the grantor had at the time of the conveyance. The land in the hands of a purchaser under a quitclaim deed remains subject to such equities.

There is a well-recognized distinction, running through all well considered cases, between a deed which purports to convey the land itself and one which purports to convey only the right, title and interest of the vendor. In such quitclaim deeds of the first class above mentioned, the vendor takes the land free from all equities of which he did not have actual or constructive notice; such deeds being in the usual form, but without warranty of title, are effective for the purpose of conveying the property from the vendor to the vendee. The second class of quitclaim deeds are those which do not constitute the vendor a *bona fide* purchaser. Such instruments generally recite in substance that the vendor sells and conveys all of his right, title and interest in and to the real property described, but does not purport to convey the real property itself. If in the deed there are words which reasonably import that the grantor intended to convey the land itself and not merely his right, title and interest therein, the vendee may occupy the position of a *bona fide* purchaser.

Some of the cases and texts holding that an instrument which merely purports to convey the right, title and interest of the grantor is a quitclaim deed and the vendee is not a *bona fide* holder follow: Cook v. Smith, 107 Texas 119; 3 A. L. R. 940 and notes; 3 A. L. R. 950; Gallup v. Huling, 241 Fed. 858; Derrick v. Brown, 66 Alabama 162; Reynolds v. Shaver, 43 Am. State Reports 36, and note on page 38; Frink v. Darst, 58 Am. St. Reports 575 and 576, 14 Ill. 304; McBride v. Caldwell, 142 Iowa 288; Adams v. Cuddy (Mass.), 25 Am. Dec. 333; Allison v. Thomas, 1 Am. St. Rep. 89 and note; Johnson v. Williams, 1 Am. St. Rep. 243, 37 Kans. 179; Merrill v. Hutchinson, 23 Am. St. Rep. 718, and note, 45 Kans. 59; Thorn v. Newsone, 53 Am. Rep. 751, 64 Texas 616; Peters v. Cartier, 20 Am. St. Rep. 508; Cummings v. Finnegan, 42 Minn. 524; Lumpkins v. Adams, 74 Texas 96; Olmstead v. Tracey, 116 Am. St. Rep. 299; Flowers v. Will, 117 Am. St. Rep. 938, and notes on page 940; Parker v. Randolph, 29 L. R. A. 33, and notes on pp. 34, 35, 37 and 38; 4. L. R. A. 12; 3 Am. Law Rep. Anno., page 945; Washburn on Real Property, section 2239; Tiedeman on Real Property, sec. 858; Devlin on Deeds, sec. 931.

A *bona fide* purchaser of a quitclaim title only is not protected, while the *bona fide* purchaser of a legal title is secure.

"The doctrine which protects a *bona fide* purchaser without notice is applicable solely to purchasers of a legal title; the purchaser of an equitable interest purchases at his peril, and acquires the property burdened with every prior equity charged upon it. Where, therefore, a party having, at most, an equitable estate in lands the legal title to which is in a trustee for a syndicate, mortgages such lands, the mortgage is void." Shoufe v. Griffiths, 31 Am. St. Rep. 910.

If the deed purports and is intended to convey only the right, title and interest in the land, as distinguished from the land itself, it comes within the strict sense of a quitclaim deed and will not sustain the defense of innocent purchaser. 39 Cyc. 1694.; Webb v. Elyton Land Co., 105 Ala. 471; Threadgill v. Bickerstaff, 87 Texas 520, 12 S. W. 67.

No covenants of title are implied in an assignment of a lease contract—such assignment only puts the assignee in the same place as was the assignor. 16 R. C. L. 843; note, 32; Am. Dec., page 356.

In addition to the foregoing it is a rule generally recognized that a deed which is only quitclaim in form is sufficient to put the grantee upon notice that his grantor has doubts concerning the sufficiency of his title, and the deed itself is notice to him that he is getting a doubtful title. Knox v. Doty, 81 Kansas 138.

It is often stated that the purchaser who receives a quitclaim deed must be presumed to have taken it with notice of all outstanding equities and interests of which he could by the exercise of reasonable diligence have obtained notice by an examination of all the records affecting the title of the property, and from all inquiries which he might make of persons in possession of the property, or of persons paying taxes thereon, or of any person who might from any record or from any knowledge which the purchaser might have, seemingly have some interest in the property. This latter rule applies in full force even now to all outstanding equities which are not shown by any writing and which cannot therefore be recorded, especially with respect to the deficiencies of title which might have been but were not evidenced, by a deed or other writing. It has perhaps been relaxed and modified

by the recording act in force in this state with respect to such instruments as are subject to be recorded, but not with respect to such equities as were not recordable, such as the right between the original parties to have a reformation of the deed or writing.

It is further said that after Sam J. Patrick became the owner of the lease by assignment he defaulted in the payment of rentals and after having his attention called to the fact went to the home of Lemaster for the purpose of adjusting the matter and paying the rentals if it could be done; that Lemaster at once told Patrick, "I have made up my mind not to receive the rentals because the lease has lapsed;" but finally agreed to do so because Mr. Patrick was a county man and upon the further condition that Patrick would correct the boundary in the lease contract so as to exclude therefrom the lands now covered by the junior lease. There is much evidence that Lemaster made such a proposition to Patrick at the time the latter was attempting to induce Lemaster to accept the past due rentals, and that Patrick by his silent acquiescence in the proposition induced Lemaster to accept the rentals and keep in force that part of the lease covered by the Gullitt deed under the belief that Patrick would and did then abandon his claim to a lease on the Abel Caudill land, which was also a small part of the Lemaster farm. This was ground to support the equitable estoppel pleaded by appellant. Appellee, Sam J. Patrick, emphatically and unequivocally denies that any such proposition was made to him, but says that Lemaster did say that perhaps A. H. Adams, the grantee, believed he was getting all the tract of land but that he was mistaken. Other witnesses deny that the statement attributed to Lemaster was made. Numerically and in weight the evidence supports appellants that Patrick agreed in consideration of Lemaster accepting the belated rentals and continuing the lease in force he (Patrick) would surrender and cease to lay further claim to that part of the original lease which is embraced in the junior lease. In order to get a perfect understanding of the facts it is proper to say that the small lease is on one edge of the larger lease; that this small tract of land was acquired by Lemaster from Abel Caudill some years after he purchased the larger tract from Mrs. Gullitt, and that at the time he so purchased it there was a fence on the line between Abel Caudill and the farm upon which

Lemaster resided, but since that time this fence has been removed, leaving only a sign of the old fence row and some trees and stumps along where the line ran. Abel Caudill, however, continued to own the land back of and adjoining the small strip sold to Lemaster. If we construe the lease as claimed by Lemaster it will extend to the lands of Abel Caudill on the north; to the lands of Warrick Bailey on the east; to the lands of P. E. Caudill on the south, and to the lands once owned by Abel Caudill on the west, for he testifies that he specifically directed A. H. Adams when drawing the original lease to let it extend only to the old line between Lemaster and Abel Caudill on the west. Reading the description from the lease without a knowledge of all the facts, it appears that the small tract was included in the boundary leased to A. H. Adams in 1916; but if, as contended by Lemaster and A. H. Adams, the contract which they tried to express in the writing did not correctly set forth the boundary, and this happened through a mutual mistake of the parties to the writing, Lemaster is entitled to have a reformation of the writing so as to conform to the actual agreement between the parties. Saylor v. Helton, 195 Ky. 195; Denny, et al. v. Crabtree, 194 Ky. 195; Sonora Oil & Gas Company v. Harris, et al. 194 Ky. 734.

Appellants insist that where persons who afterwards organize a corporation, subscribe for all of its capital stock and become its chief officers, had notice of an adverse claim with respect to an oil and gas lease which was transferred to the corporation by them in consideration of the issual to them of its entire capital stock, the corporation will be held to have acquired such lease with full notice of all outstanding equities. To this proposition we cannot always assent; the facts must be considered. Here it appears from the record that Patrick actually sold an interest in the lease to his brother, A. B. Patrick, and another part to E. L. Stephens, at the time it being agreed that Sam J. Patrick would convey the lease to the corporation for the use and benefit of all three said purchasers, in consideration of the corporation issuing and delivering to Sam J. Patrick, A. B. Patrick and E. L. Stephens all of its capital stock, and that this deal was carried out. It also satisfactorily appears that Sam J. Patrick did not disclose to A. B. Patrick or to E. L. Stephens the fact that appellees were making an adverse claim to a part of their lease, and there is no evidence

to show that either A. B. Patrick or E. L. Stephens knew anything of such adverse claim until after the corporation had become the owner of the lease. A. B. Patrick was made president of the corporation, E. L. Stephens, secretary, and Sam J. Patrick, vice president and treasurer, and all three were directors. It is a well-established rule that officers of a corporation must deal fairly with it when selling to or buying property from it, and must always disclose to the corporation any defects or insufficiencies in the title, if any, to the property which the officer is buying from or selling to the corporation. In a case like this there is an exception based upon the adverse relation of the seller to the buyer. Notice is not to be imputed to the corporation merely because one or more of its officers have knowledge of the facts, especially where the circumstances are such as to raise a clear presumption that the officer did not communicate his knowledge to the corporation, as where the fact is one which he is interested in concealing from the corporation. In such case the corporation will not be charged with notice of facts which came to the officer under such circumstances. 14 A. C. J., p. 490. The rule is equally well established that the corporation is charged with constructive knowledge regardless of its actual knowledge of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of his employment within the scope of his authority, and the corporation is charged with such knowledge even though the officer or agent does not in fact communicate his knowledge to the corporation. As the stockholders of the Model Oil Company are distinct from that entity, and as Sam J. Patrick was the only director of the corporation having knowledge of the outstanding equities against the leasehold and did not communicate that fact to either of the other directors of the corporation or to the corporation, and was at the time dealing with the company at arm's length, it can scarcely be said that the corporation had knowledge of or can be charged with having knowledge of the outstanding equities against the lease unless the corporation took an assignment from Sam J. Patrick of his right, title and interest in and to the leasehold only, in which event the corporation is in no better position than is Patrick, who it appears was not an innocent purchaser for value, but knew of the deficiency in and outstanding equities against the lease

contract and that it did not include the small boundary covered by the junior lease.

While the holder of a recorded oil and gas lease cannot be deprived of his lease except by a properly executed release or by an entry on the margin of the record book in the office of the clerk of the county court, witnessed by the clerk, this rule has no application to the facts in this case showing that by mutual mistake Lemaster and Adams included in the lease contract lands not intended to be leased, and that afterwards Sam J. Patrick, then the holder of the lease, agreed with Lemaster that he would release and discharge and surrender part of the leasehold to the lessor on condition the lessor would accept past due rentals and continue another part of the leasehold in force. When the transaction is between the lessor and lessee or between the lessor and one holding only the right, title and interest of the lessee in and to the lease, the mistake may be corrected by a court of equity on proper and seasonable application.

As all the evidence in the record with respect to a mutual mistake of the parties to the original lease tends to establish that mistake, appellants were entitled to a reformation of the original lease, and this, of course, would exclude from such original lease the small tract purchased by Lemaster from Abel Caudill. The weight of the evidence also appears to sustain the contention of appellants of equitable estoppel against appellees on the grounds that Sam J. Patrick, after the lapse of the original lease for non-payment of rentals, silently acquiesced in and so acted and conducted himself with respect to the proposition of Lemaster to accept the rentals upon the Gullett tract if Patrick would yield up his claim to the lease on the small Abel Caudill tract, that Patrick and his assignees are now estopped to assert title to the lease on the Able Caudill tract. One cannot by his silent acquiescence mislead another to his hurt and afterwards avoid the estoppel if properly pleaded.

For the reasons indicated the judgment must be and is reversed for proceedings not inconsistent with this opinion.

The whole court sitting.