## H. B. Rice & Company v. Miners' Elkhorn Coal Company et al.

(Decided May 30, 1930.)

WHEELER & WHEELER for appellant.

KIRK & WELLS for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming.

The appellee Miners' Elkhorn Coal Company owned a coal mining lease on the farm of George B. Rice in Johnson county. The lease provided, among other things, that the landowner, George B. Rice, should be paid a minimum royalty of $2,400 a year in monthly installments of $200 each, and a lien was retained on all the property of the company to secure the payment of the royalty. The company began operations during the year 1920. Its capital stock consisted of 300 shares of the par value of $100 each, the majority of which was owned by the appellee, F. B. Preston, who was president and general manager of the company. The appellees Z. Wells, W. L. Preston, Mose Rice, and John B. Dills were stockholders and directors of the company.

During the year 1923 the company sought a loan from the Paintsville National Bank, and the bank agreed to make the loan if the directors would indorse the company's notes; $500 was borrowed from the Paintsville National Bank on March 28, 1923, and the company's note for that amount was indorsed by F. B. Preston and W. L. Preston; $3,500 was borrowed on May 12, 1923; and $3,000 on January 7, 1924, and each of these notes was indorsed by all the directors of the company. On January 7, 1924, when the third note was executed, the board of directors of the Miners' Elkhorn Coal Company passed a resolution authorizing the president to execute a mortgage on the personal property of the company to secure the indorsers on these notes from loss. The mortgage was executed on March 19, 1924, and lodged for record in the county clerk's office on March 24, 1924. These notes were renewed from time to time, but in December, 1924, the Paintsville National Bank refused to accept further renewals, and demanded payment of the notes. The indorsers took up the notes and executed their own notes in lieu thereof, and on December 26, 1924, filed suit in the Johnson circuit court against the Miners' Elkhorn Coal Company to recover $7,000 which they claimed to have paid for the company as indorsers on the

three notes and to enforce their mortgage lien. The defendant company was in arrears in the payment of its royalty to George B. Rice to the amount of $750, and George B. Rice joined as a plaintiff in the petition, and asked for a judgment for the amount of royalties then due him, and that he be adjudged a superior lien. On January 7, 1925, which was the 3rd day of the January term of the Johnson circuit court, a default judgment was entered against the Miners' Elkhorn Coal Company, in which it was adjudged that George B. Rice recover the sum of $750 with interest and that Z. Wells, F. B. Preston, W. L. Preston, Mose Rice and John B. Dills recover the amount of the three notes referred to in the petition aggregating $7,000, and a sale of a sufficient amount of the company's property to satisfy these debts was ordered. The property was advertised, and mining equipment of the company was sold on February 2, 1929. Z. Wells purchased the property as trustee for the directors for the sum of $6,750, and a few days thereafter the property purchased by him was sold to the appellee Northeast Coal Company for $8,500. The Northeast Coal Company paid this sum in cash, and it was used by appellees to pay off the claim of George B. Rice, the three notes they had executed to the Paintsville National Bank, and the costs of the case.

On February 9, 1925, G. H. Rice, doing business as H. B. Rice & Co., brought this action against the Miners' Elkhorn Coal Corporation, George B. Rice, John B. Dills, W. L. Preston, Z. Wells, Moses Rice, and F. B. Preston, in which he alleged that the Miners' Elkhorn Coal Company was indebted to him in the sum of $1,643.54, and that the judgment against the Miners' Elkhorn Coal Company in the case in which George B. Rice and others were plaintiffs had been procured by fraud and collusion on the parts of the plaintiffs in that case, and that the mortgage executed on March 19, 1924, to indemnify the mortgagees therein against loss by reason of having indorsed certain notes of the Miners' Elkhorn Coal Company, was fraudulent, and he asked that the judgment and sale thereunder be set aside, that his attachment be sustained, that the mortgage be set aside, and that he be adjudged a superior lien on the company's property. By an amended petition he made the Northeast Coal Company a party. On the motion of plaintiff, the action was transferred to the equity docket and consolidated with the action of George B. Rice et al. v. Miners' Elkhorn Coal Company.

On the submission of the case, G. H. Rice, doing business as H. B. Rice & Co., was given a personal judgment against the Miners' Elkhorn Coal Company, and his attachment was sustained as to all the property levied upon, except the property which was sold under the mortgage executed by the Miners' Elkhorn Coal Company to F. B. Preston and others, and his petition as against F. B. Preston, Z. Wells, W. L. Preston, John B. Dills, Mose Rice, George B. Rice, and Northeast Coal Company was dismissed, and from that part of the judgment the plaintiff has appealed.

Appellant attacks the judgment of January 7, 1925, on several grounds. It is first insisted that there was a misjoinder of parties plaintiff, in that the landowner, George B. Rice, who was seeking to enforce his lien for unpaid royalties, was not a proper or necessary party plaintiff in an action in which the other plaintiffs were seeking to enforce a mortgage lien. Granting for the sake of argument that there was a defect of parties plaintiffs, this only rendered the judgment erroneous and not void, and it cannot be successfully attacked in a collateral proceeding such as this. There is no evidence that the judgment of January 7, 1925, was procured by fraud or collusion, but, on the other hand, it appears that on December 17, 1924, nine days before the suit was instituted, F. B. Preston, president of the Miners' Elkhorn Coal Company, wrote a letter to all the creditors, including appellant, in which he set out the facts relative to the company's financial condition, and notified them that, unless some arrangement could be made whereby the creditors would take over the property, the mortgagees named in the mortgage of March 19, 1924, would be compelled to take such action as might be necessary to protect their rights. Action was delayed until the last day for filing suits for the January, 1925, term of court.

Appellant's contention that the mortgage was procured by fraud is not sustained by the evidence. The suit attacking the mortgage was not brought within six months after the mortgage was lodged for record, and, of course, was not brought in time if the mortgage is attacked as a preference under section 1910 of the Kentucky Statutes. All the appellees who were directors of the company and indorsers on the three notes, testified that it was agreed, before they indorsed the notes, the company would execute a mortgage to them on certain property owned by it to indemnify them against loss and

that the mortgage of March 19, 1924, was executed pursuant to that agreement.

Section 1910, Kentucky Statutes, refers to a mortgage executed in good faith to secure a debt created simultaneously with the execution of the mortgage and, as that statute has been construed, a promise made at the time a debt is created to execute a mortgage at some future time does not bring the mortgage within the saving clause of the statute. Aulick v. Reed, 104 Ky. 465, 47 S. W. 331, 20 Ky. Law Rep. 653; Darnell v. Lewis, 94 Ky. 455, 22 S. W. 843, 15 Ky. Law Rep. 222; McCutcheon v. Caldwell 90 Ky. 249, 13 S. W. 1072, 12 Ky. Law Rep. 145. However, as above stated, the mortgage cannot be successfully assailed under section 1910 of the statutes, since no suit was filed within the time required by section 1911.

Nor was the transaction in violation of section 1906 of the Kentucky Statutes. It was not a fraudulent transfer within the meaning of that section. It was a mortgage to secure an existing debt at a time when the corporation was a going concern and, so far as the evidence shows, was solvent, and it is well settled that such a transfer is not fraudulent. Here there is not the slightest room to doubt the entire good faith of appellees. The facts wholly fail to establish any actual fraud in the making of the mortgage or constructive fraud by reason of insolvency at the time. Appellant offered no evidence of the value of the property of the company in March, 1924, as part of a going concern. He took the depositions of F. B. Preston, Z. Wells and W. L. Preston, as if under cross-examination and sought to prove by them that the company was insolvent when the mortgage was executed. Each of them testified that the assets of the company as a going concern then amounted to approximately $60,000, and that the liabilities, including the three notes for $7,000 indorsed by appellees, and debts of $11,000 secured by liens on certain machinery, amounted to $24,000. The company had made about $16,000 in profits during the year 1922, and probably a small profit in 1923. There was a decline in the price of coal during 1924, and the physical condition of the mine changed for the worse. A parting in the coal seam appeared, and the coal seam narrowed to a point where a competent engineer, who investigated the property in November or December, 1924, declared that it could not be worked at a profit.

In July, 1924, several months after the mortgage was executed, F. B. Preston, the president of the company,

sold a house and lot in Paintsville, Ky., for $3,100, and advanced the proceeds to the company in an effort to maintain its credit. W. L. Preston advanced approximately $2,300 to the company after the execution of the mortgage, and it became indebted to the other directors in smaller sums, for none of which debts they took any security. Z. Wells purchased additional stock of the company at par in October, 1923. Such circumstances as may be considered "badges of fraud" are satisfactorily explained by these and other facts.

A board of directors may borrow money for the present needs of a corporation and authorize certain directors to indorse the notes and secure them by mortgage on the corporation's property if done in good faith. A director can lend his credit to the corporation by indorsing its paper in order to obtain needed cash and secure himself by a mortgage upon the corporation's property. While such transactions are looked upon with suspicion, and the burden is upon the directors to establish their good faith, the appellees in the present instance have sustained that burden. As said in Wyoming Coal Sales Co. v. Smith-Pocahontas Coal Co., 105 W. Va. 610, 144 S. E. 410, 412, 62 A. L. R. 740:

> "It is unquestionably lawful for the managing officer of a solvent, or even a failing, corporation to make it a loan and to take security for the loan. The transaction will be given close judicial scrutiny, but, if free from fraud, will be upheld."

In Cook on Corporations, vol. 2, sec. 692, the author says:

> "It is undoubtedly true that the law allows a director to loan money to a corporation, and allows the corporation, while it is solvent, to give a mortgage to the director, to secure the money so loaned. The giving of the mortgage is viewed with suspicion, but it is legal when it is perfectly free from actual fraud. . . .
>
> "But where the corporation is insolvent an entirely different question arises. There has been a difference of opinion in the courts, but the weight of authority clearly and wisely holds that an insolvent corporation cannot pay or secure a pre-existing debt due to a director in preference to debts due others, either by transferring property or cash to him or by giving him a mortgage on corporate

assets. But a corporation acting in good faith and without any purpose of defrauding its creditors, but with the sole object of continuing a business which promises to be successful, may give a mortgage to .directors who have lent their credit to it, in order to induce a continuance of that credit, and in order to obtain renewals of maturing paper at a time when the corporation, although it may not be then in fact possessed of assets equal at cash prices to its indebtedness, is in fact a going concern, and is intending and is expecting to continue in business. Even though a corporation is insolvent, yet, if the directors believe it is solvent, although in financial distress, they may loan money to the corporation and take securities as collateral thereto, and they are not bound to know that the corporation is insolvent.''

See Thompson on Corporations (3d Ed.) vol. 8, sec. 6162; Fryer v. Wiedemann, 148 Ky. 379, 146 S. W. 752, 39 L. R. A. (N. S.) 1011.

The authorities are not altogether uniform as to powers of directors of insolvent corporations to protect themselves. A number of authorities pro and con are collected in Corey v. Wadsworth, 118 Ala. 488, 25 So. 503, 44 L. R. A. 766; Stuart v. Larson (C. C. A.) 298 F. 223; and Pomeroy, Equity Jurisprudence, (5th Ed.) sec. 2319 et seq. A discussion of this question, however, would serve no useful purpose, since, as we have seen, there is no evidence that the Miners' Elkhorn Coal Company was insolvent on March 19, 1924, when the mortgage in question was executed.

It is argued that, as the property at public sale less than a year after the mortgage was executed brought less than $7,000, and the debts amounted to $24,000 when the mortgage was executed, insolvency may be inferred. In response to this, it is sufficient to say that only a portion of the equipment on hand when the mortgage was executed was sold by the master commissioner; $11,000 of lien debts had been satisfied by the return of machinery on which the creditors had liens. The leasehold, miners' houses, and other buildings were not included in the sale. Market conditions had changed, and the physical condition of the mine had become such as to render its operation unprofitable. It is also argued that all lienholders were not made parties in the foreclosure proceeding, but

there is no evidence that there were any unsatisfied liens on the property covered by the mortgage and sold at the decretal sale.

The judgment is affirmed.